## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **CAPITAL SECURITY SYSTEMS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **1:14-cv-1516-WSD** |
| **NCR CORPORATION, SUNTRUST BANKS, INC., and SUNTRUST BANK,** | |
| **Defendants.** | |

## **OPINION AND ORDER**

This matter is before the Court for construction of the disputed claims in United States Patent Nos. 5,897,625 (the "'625 Patent"); 7,653,600 (the "'600 Patent"); 7,991,696 (the "'696 Patent"); and 8,121,948 (the "'948 Patent") (collectively, "Patents-in-Suit"). Each party submitted memoranda supporting its constructions of the claim terms, and, on May 24, 2016, the Court held its Markman[1] hearing.

---

[1] Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).

## I.    BACKGROUND

On May 19, 2014, Plaintiff Capital Security Systems, Inc. ("Capsec") filed this action for patent infringement against Defendants NCR Corporation ("NCR"), SunTrust Banks, Inc., and SunTrust Bank.[2]  The Patents-in-Suit relate to advanced automated teller machines ("ATM") that automate the process for dispensing cash in exchange for deposited checks.  NCR sells ATMs to financial institutions.  Capsec claims certain of NCR's ATM models infringe its patents.

The '948 and '696 Patents issued from continuations of the '600 Patent application.  These three patents also claim priority through a continuation-in-part ("CIP") application upon which the '625 patent was issued.  The specifications of the '625 Patent are largely similar to the material found in the other three Patents-in-Suit.[3]

The technology of the patents essentially performs the functions that are performed by a teller by allowing a deposit to be made and a cash transaction to occur at an ATM.  (Markman Hr'g Tr. [132] ("Tr.") at 4).  The '600 Patent describes the invention as:

---

[2]      The parties agreed to stay the case against SunTrust.  ([47], [54]).

[3]      The invention disclosures of the '600, '669 and '948 Patents have nearly identical contents, but do not share identical column and line numbers because of differences in formatting.  Supporting citations from the '600 Patent may also be found in the '696 and '948 Patents, and vice versa.

> [A]n automated banking system including one or more machines which perform the usual ATM functions, but also have such significant security safeguards that they allow the cashing of monetary transaction documents such as checks or money orders, or handling of cash equivalent transactions such as making a deposit in the bank account of the user, without the aid of a teller.  These functions are achieved by having sufficient validation of the identity of the user, validation of document, such as being a signed or endorsed check or the like, validation of the amount to be paid in cash or deposited, and validation of the banking system parameters or rules for the customer and/or transaction.

'600 patent, 3:48-60.  Similarly, the '625 Patent describes "[a]n automated document cashing system [that] includes a reader for capturing an image of a negotiable instrument and recognizing the authorized signature as well as the amount written thereon."  '625 Patent, Abstract.  The patent describes a machine capable of accepting for deposit bank notes, checks, and money orders.  '625 Patent, 4:25-41.

A basic understanding of the parts of a check is helpful to understanding the claimed invention of the Patents-in-Suit:



([57.1] at 2).  The legal amount recognition ("LAR") line, the portion of a check

where the amount is written out in words, is shown at 12.  The courtesy amount

recognition ("CAR") line, the portion of a check where the amount is written

numerically, is shown at 13.  The signature field is shown at 15.  The endorsement

signature field on the opposite side of the check is not pictured.  The processor of

the claimed invention "reviews images from a legal amount recognition (LAR) line

and a courtesy amount recognition (CAR) line and ascertains an apparent signature

from the document image in order to validate the document."  '600 Patent, claim 1;

see also '696 Patent, claim 1; '948 Patent, claim 1.  The Patents-in-Suit disclose

the use of optical character recognition ("OCR") technology to validate certain

written contents of a deposited document.

The Court discusses the contents of the Patents-in-Suit in further detail in its

4

discussion of the individual claims at issue.

## II.   LAW OF CLAIM CONSTRUCTION

### A.   General Principles of Claim Construction

Patent infringement actions are composed of two phases.  First, in the claim construction phase, the court determines the scope and meaning of the patent claims as a matter of law.  Second, the claims are compared to the allegedly infringing device.  See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998).  To determine the meaning of claims, the district court uses three primary sources, constituting the intrinsic record:  (1) the claims, (2) the specification, and (3) the prosecution history.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996).

Claim construction begins with the language of the claims.  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention.").  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips, 415 F.3d at 1312 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)); see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,

868 F.2d 1251, 1257 (Fed. Cir. 1989) ("A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention.").  The words of a claim generally are given the ordinary and customary meaning they have to persons of ordinary skill in the art in question at the time of the invention.  <u>Phillips</u>, 415 F.3d at 1312-13; <u>Vitronics</u>, 90 F.3d at 1582.  Claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  <u>Phillips</u>, 415 F.3d at 1314-15; <u>Vitronics</u>, 90 F.3d at 1582.

While the language of the claims is the first source for interpretation, "[t]he claims, of course, do not stand alone."  <u>Phillips</u>, 415 F.3d at 1315.  They are part of a fully integrated written instrument that includes a specification.  <u>Id.</u> (citing <u>Markman</u>, 52 F.3d at 978).  Accordingly, "claims 'must be read in view of the specification, of which they are a part.'"  <u>Id.</u> (quoting <u>Markman</u>, 52 F.3d at 979).  The prosecution history also is intrinsic evidence used to supply the proper context for claim construction.  <u>Home Diagnostics, Inc. v. LifeScan, Inc.</u>, 381 F.3d 1352, 1356 (Fed. Cir. 2004).  The prosecution history is comprised of the complete record of the proceedings before the United States Patent and Trademark Office ("PTO"), including prior art cited during examination.  <u>Phillips</u>, 415 F.3d at 1317;

6

Vitronics, 90 F.3d at 1582-83; Markman, 52 F.3d at 980. It also includes communications between the examiner and the applicant. Phillips, 415 F.3d at 1317. The history can indicate the inventor's understanding of the invention, and "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.

Courts may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history." Markman, 52 F.3d at 980. Such evidence typically includes dictionaries, treatises, and testimony of the inventor or experts. Id. Extrinsic evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language," and is appropriate only when the available intrinsic evidence is not dispositive. Phillips, 415 F.3d at 1317, 1319.

B.    Construction of Means-Plus-Function Terms

A patent applicant may express a claim element "as a means or step for performing a specified function" whereby the claim is interpreted to encompass the corresponding structure disclosed in the specification. 35 U.S.C. § 112(f). There are two steps to a means clause construction under Section 112. The first step is to identify the function recited in the claim. The next is to identify the corresponding structure disclosed in the specification. See Kemco Sales, Inc. v. Ctrl. Papers Co.,

208 F.3d 1352, 1361 (Fed. Cir. 2000).  "Structure disclosed in the specification is 'corresponding' structure only if the specification . . . clearly links or associates that structure to the function recited in the claim."  <u>Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 248 F.3d 1303, 1311 (Fed. Cir. 2001) (internal quotations and citations omitted).  Structure must be able to perform the corresponding function and the structure and corresponding function must be "clearly linked" in the specification.  <u>Id.</u>  "The 'cost' of using a § 112[(f)] function statement . . . is that the scope of the claim is restricted to the particular structures or acts disclosed in the specification, as well as their equivalents."  <u>Northpeak Wireless, LLC v. 3Com Corp.</u>, No. 09-cv-602-SI, 2015 WL 5117020, at *4 (N.D. Cal. Aug. 28, 2015) (citing <u>Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n</u>, 161 F.3d 696, 703 (Fed. Cir. 1998)).

### III.   DISPUTED CLAIM TERMS[4]

A.   <u>Terms NCR Claims are Indefinite</u>[5]

NCR does not offer a proposed construction for several terms, contending

these terms are invalid for indefiniteness.  A patent is presumed to be valid and "a

defendant bears the burden of proving invalidity by clear and convincing

evidence[.]"  <u>Shire LLC v. Amneal Pharm., LLC</u>, 802 F.3d 1301, 1306 (Fed. Cir.

2015) (citation omitted).  "[A] patent is invalid for indefiniteness if its claims, read

in light of the specification delineating the patent, and the prosecution history, fail

---

[4]     The parties have agreed to the following constructions, either initially or in
their briefing:
        The agreed construction for the phrase "Analyzing the signed monetary
transaction document for the presence of a signature" in Claim 15 of the '696
Patent is as follows:  "Determining whether there is a signature on the signature
line of the check or money order."
        The agreed construction for the phrases "intelligent character recognition
engine(s)" and "ICR Engine" in Claim 6 of the '600 Patent, Claim 8 of the '696
Patent, and Claim 7 of the '948 Patent is as follows:  "a software engine employing
recognition intelligence comprising a neural network trained by exposure to
character training sets."
        The parties agree that the term "reader"  in Claims 15 and 17 of the '625
Patent, Claim 1 of the '600 Patent, and Claims 1 and 9 of the '948 Patent should be
given its plain and ordinary meaning.  The parties also agree that the term
"acceptance of deposit"/"acceptance of deposit indicator" in Claim 1 of the '600
Patent and Claim 1 of the '696 Patent should be given its plain and ordinary
meaning.
[5]     NCR also contends certain means-plus-function claims are indefinite
because they lack structure.  The Court addresses these arguments separately.

to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2124 (2014). "What the statute requires . . . 'is that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty.'" Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1370 (Fed. Cir. 2014) (quoting Nautilus, 134 S. Ct. at 2129). "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." Id. at 1371. "Although absolute or mathematical precision is not required, it is not enough . . . to identify some standard for measuring the scope of the phrase." Id. at 1370-71 (citation omitted). "The definiteness standard 'must allow for a modicum of uncertainty' to provide incentives for innovation, but must also require 'clear notice of what is claimed, thereby appris[ing] the public of what is still open to them.'" Id. at 1370 (quoting Nautilus, 134 S. Ct. at 2128-29).

The Court first addresses whether to consider NCR's indefiniteness argument at this stage in the proceedings. Although "general principles of claim construction" apply in the face of an allegation of indefiniteness, Nautilus, 783 F.3d at 1377 (internal quotation marks and citation omitted), "several well-settled principles tend to discourage rulings on indefiniteness at the Markman stage,"

10

Uretek Holdings, Inc. v. YD W. Coast Homes, Inc., No. 8:15-CV-472-T-36JSS,

2016 WL 3021880, at *3 (M.D. Fla. May 26, 2016) (quoting CSB-Sys. Int'l, Inc.

v. SAP Am., Inc., No. 10-cv-2156, 2011 WL 3240838, at *17 (E.D. Pa. July 28,

2011)).  First, the burden of proof is higher for establishing indefiniteness than for

determining a term's construction.  Second, the legal standard for evaluating

indefiniteness is different than for determining a term's construction.  These

differences arise from the fact that "unlike a Markman proceeding that gives

meaning to patent claims, indefiniteness invalidates the claims entirely."  Id.

(quoting CBS-Sys., 2011 WL 3240838, at *18).  The Federal Circuit has made

clear that it has "certainly not endorsed a regime in which validity analysis is a

regular component of claim construction."  Phillips, 415 F.3d at 1327.  In light of

these considerations, courts often decline to make invalidity determinations at the

claim construction stage.  See, e.g., Uretek, 2016 WL 3021880, at *3 ("[I]t would

be more appropriate and logical to defer the full consideration of any potential

indefiniteness challenge to the summary judgment stage, after all fact and expert

discovery has been completed."); Intergraph Hardware Techs. Co. v. Toshiba

Corp., 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("[The] indefiniteness

argument is inappropriate at the claim construction stage.").

As the court in <u>Vapor Point LLC v. Moorhead</u>, noted, many of the courts declining to consider indefiniteness arguments "were not faced, as this Court is, with multiple disputed claim terms in which one party refused to present a proposed construction beyond claiming indefiniteness."  No. 4:11-cv-4639, 2013 WL 11275459, at *16 (S.D. Tex. Dec. 18, 2013).  In <u>Moorhead</u>, the court adopted the reasoning of the court in <u>CSB-Sys.</u>, 2011 WL 3240838.  The <u>CBS-Sys.</u> court was faced with an almost identical dilemma:  one party raised indefiniteness arguments as to multiple claim terms without either (a) offering an alternative proposed construction for such terms or (b) moving for summary judgment on invalidity grounds.  The court considered the indefiniteness contentions "in order to determine only whether such claims are amenable to construction and, if so, what construction is appropriate for the claimed ambiguous terms in light of the present intrinsic and extrinsic evidence provided." <u>CSB-Sys.</u>, 2011 WL 3240838, at *18.  The court stressed that "[a]ny such construction of these terms, however, is done without prejudice to [the party alleging invalidity's] ability to challenge the validity of these terms for indefiniteness at the summary judgment stage."  <u>Id.</u>  The Court adopts the <u>CSB-Sys.</u> and <u>Moorhead</u> approach here for all claims for which NCR alleges the claim term is indefinite and not capable of construction.

12

1.     Ascertain(s) an Apparent Signature

NCR contends the term "ascertain(s) an apparent signature" in Claims 1 and 2 of the '948 Patent, Claim 1 of the '600 Patent, and Claim 1 of the '696 Patent is indefinite under 35 U.S.C. § 112(b).  Capsec proposes the term be construed as "to discover an apparent signature from the document image."  NCR relies on Texas Instr. Inc. v. U.S. Int'l Trade Comm'n, 988 F.2d 1165 (Fed. Cir. 1993) to support that the modifier "apparent" is presumed to be more than mere surplusage.  In Texas Instr., the Federal Circuit rejected a patentee's proffered claim construction because it "would render the disputed claim language mere surplusage."  988 F.2d at 1171.  NCR argues that the question thus becomes whether the specification provides some standard for measuring to what degree an "apparent" signature is different than a "signature."  ([59] at 21).  NCR argues that the specification does not provide any guidance or standard to measure the degree, and, even if "apparent" were quantifiable, it is unclear from the specification what quantity is measured and to what degree.  ([59] at 26-27).  It argues that, based on the specification, "apparent" could mean (a) determining with "an acceptable confidence level that a signature is present" or (b) detecting "unskilled forgeries or ambiguous signatures."  '948 Patent, 2:16-25, 4:45-51.

Capsec argues that "apparent signature" is plain and ordinary language, and needs no further parsing by the Court. ([57] at 41). In support of its argument, Caspec notes that the abstract of the '600 Patent refers to "validating the <u>presence</u> of a signature" on a monetary document such as a check. It argues that an "apparent signature" in the context of the claim means that the signature is apparent or present. In further support of its argument, Capsec points to the specification of the '600 Patent, which teaches that one document validation procedure "is a determination that a signature is present. That is, the check is signed at the signature line. . . . Also . . . there should be a validation by the machine that a signature is present on the endorsement line." '600 Patent, 2:9-20. Capsec argues that it is irrelevant that a "present" signature is never explicitly defined as an "apparent" signature, because "the statute does not require . . . use [of] the exact same words in both the specification and the claims." ([57] at 42 (quoting <u>SDS USA, Inc. v. Ken Specialties, Inc.</u>, 107 F. Supp. 2d 574, 579 (D. N.J. 2000))).

The Court agrees with NCR that the modifier "apparent" may be interpreted in many ways, and thus is not, as Capsec contends, plain and ordinary. The Court finds, however, that NCR fails, at this stage of the proceedings, to meet its burden to show indefiniteness by clear and convincing evidence. NCR does not provide

any expert testimony, prior art, or other evidence to show that a person skilled in the art would be unable to ascertain, with reasonable certainty, the scope of the invention.  See Nautilus, 134 S. Ct. at 2124.  The Court finds the term amenable to construction, and construes the term, in accordance with the specification, as follows:  "to discover the presence of a person's cursive signature in the signature field."[6]

### 2.   Transactional Operator

NCR next argues that the term "transactional operator" in Claim 15 of the '625 Patent is indefinite.  Capsec proposes the following construction:  "A computer within an automated banking system that, after deposit of sufficient cash, permits the user to perform the requested transaction."  NCR argues that "the term is not defined or mentioned in the specifications of the [Patents-in-Suit], and Plaintiff has identified no extrinsic evidence that it has any understood meaning in the art."  ([59] at 49).  NCR, however, bears the burden to prove indefiniteness by clear and convincing evidence.  Shire, 802 F.3d at 1306.  NCR has not done so

---

[6]      The Court's construction is supported by the differentiation of *validating* a signature from recognizing the *presence* of a signature.  Compare '625 Patent, Claim 15 ("reading the document for . . . a valid signature") with '600 Patent, Claim 1 ("ascertaining an apparent signature").  Further, the kind of signature that is the subject of the patents is a cursive one.  See, e.g., '625 Patent, 4:9-16, Claims 1, 20, 35.

here, and the Court declines to find, at this stage, that "transactional operator" is indefinite.  The Court finds the term amenable to construction, and adopts Capsec's construction of the term.

### 3.   Legal Amount Recognition Engine(s)

NCR next argues that the term "legal amount recognition engine(s)" in Claim 6 of the '600 Patent, Claim 8 of the '696 Patent, and Claim 7 of the '948 Patent is indefinite.  Capsec proposes the following construction:  "a software engine employing recognition intelligence comprising a neural network trained by exposure to character training sets for identifying the legal amount of a check." The parties agreed on a proposed construction for the phrases "intelligent character recognition engine(s)" and "ICR Engine" as:  "a software engine employing recognition intelligence comprising a neural network trained by exposure to character training sets."  NCR argues that Capsec's proposed construction "transparently attempts to re-purpose intrinsic evidence for previously agreed upon but wholly different terms . . . ."  ([59] at 43).  NCR again attempts to place the burden on Capsec to show that its claim terms are definite.  The Court finds NCR fails to show by clear and convincing evidence that the term is indefinite.  See Shire, 802 F.3d at 1306.  The Court finds the term amenable to construction, and

construes the term as follows:  "a software engine for identifying the legal amount of an instrument."

B. <u>Valid Signature, Valid, Validate the Document, and Validity of the Document</u>

The parties' proposed constructions are as follows:

| Phrase | NCR's Construction | Capsec's Construction |
|---|---|---|
| "valid signature" '625 Patent, Claim 15 | a cursive signature confirmed as being the authentic signature of a qualified user | a signature that complies with specific banking system parameters, where non-compliance would result in rejection of the monetary document (properly construed) or otherwise disrupt an automated banking system's process of accepting a monetary document |
| "valid" '696 Patent, Claim 1 | authentic | compliant with specific banking system parameters, where non-compliance would result in rejection or otherwise disrupt an automated banking system's process of accepting a monetary document |
| "validate the document" '600 Patent, Claim 1 | determination that the check or money order is authentic and bears the authentic signature of the qualified user | confirm the compliance of a monetary document with specific banking system parameters |

17

| "validity of the document" '948 Patent, Claim 1 | determination that the check or money order is authentic and bears the authentic signature of the qualified user | compliance of a monetary document with specific banking system parameters |
| --- | --- | --- |

NCR contends that its proposed "authentic signature" and "authentic" constructions comport with the intrinsic record, because the patents require that the signature of the user be confirmed as valid.  ([59] at 58).  The Patents-in-Suit teach that when depositing a check into an ATM, "the foremost problem is integrity of the document being exchanged for cash, in particular, verification of signatures on checks or money orders being cashed." '625 Patent, 3:1-3.[7]  To overcome this

---

[7]     The '600 Patent provides that the automated banking system machines described perform:

> usual ATM functions, but also have such significant security safeguards that they allow the cashing of monetary transaction documents such as checks or money orders, or handling of cash equivalent transactions such as making a deposit in the bank account of the user, without the aid of a teller.  These functions are achieved by having sufficient validation of the identity of the user, validation of document, such as being a signed or endorsed check or the like, validation of the amount to be paid in cash or deposited, and validation of the banking system parameters or rules for the customer and/or transaction.

'600 Patent, 3:48-60.  This language supports that the security sought is to allow these teller-less ATM transactions to be completed only if the authorized user is identified as the person who engages in the transaction and that other banking system parameters are met.

problem, the patents disclose evaluating the cursive signature to see if it is the

authentic signature of a qualified user:

> The cashing of checks or money orders is achieved by the ability to
> read the cursive[8] signature of the drawer or maker of the instrument,
> to verify the cursive signature as being that of a profiled or qualified
> user who has inserted his ATM card into the machine, and to read the
> amount on the cursive legal line on the check and the dollar amount
> line (the CAR line) as well as the bank and account identifications
> printed in magnetic ink characters on the check.

'625 Patent, 4:9-16.

Capsec argues that "valid" includes the element of compliance with banking

system parameters.  At oral argument, Capsec stated that the parameters could be

set wherever an institution chooses, including simply to detect the presence of

markings on the signature line.  (See Tr. at 140).  This position runs counter to the

stated outcome explained in the patents that validity seeks to ensure the person

signing the instrument is the person authorized to do so.  See '600 Patent, 3:55-56

("These functions are achieved by having sufficient validation of the identity of the

user . . . .").

---

8        A "cursive" signature is a specific signature type.  A "cursive" signature is
commonly defined and widely known in the population as a signature "flowing
often with the strokes of successive characters joined and the angles rounded."
Cursive, Merriam-Webster Dictionary.  A signature is commonly defined as "a
person's name written in that person's handwriting."  Signature, Merriam-Webster
Dictionary.

Figure 25 of the '625 Patent specification is a flow chart of a signature verification and character recognition process.  The flow chart includes the following step:  "send recognized characters, along with confidence level to calling function."  '625 Patent, Figure 25.  In addition, "[t]he recognized characters [from the signature line and amount lines] are then evaluated from the standpoint of a present confidence level in a step 460."  '625 Patent, 13:34-41; see also '600 Patent, 14:44-51; '696 Patent, 14:52-59; '948 Patent, 14:54-61.  Capsec contends that this intrinsic evidence, among other evidence, shows that "validation does not speak to whether a document . . . is authentic, but rather, whether it will be accepted or rejected by a particular bank."  ([57] at 24).  Capsec argues that, "by way of illustration, signature validation may be attained merely by the presence of a signature."  (Id. (emphasis in original) (citing '696 Patent, Abstract ("Validation of the document involves on or more of:  validating the presence of a signature . . ."))).

The Court disagrees with Capsec's proposed construction, in part because it equates the term "valid" with the concept of a "presence," such that a "valid signature" could very well be a mark other than a signature.  As NCR notes, the specification and the claims show that *validating* a signature is separate and distinct from recognizing the *presence* of a signature.  Compare '625 Patent, Claim

20

15 ("reading the document for . . . a valid signature") <u>with</u> '600 Patent, Claim 1

("ascertaining an apparent signature").  The discussion above regarding the term

"ascertaining an apparent signature" further underscores this difference.  Simply

testing for the presence of a signature in the signature line would not address the

outcome the applicants purported to achieve, namely "the ability to read the

cursive signature of the drawer or maker of the instrument, to verify the cursive

signature as being that of a profiled or qualified user."  '625 Patent, 4:9-16.  As

NCR also notes, while confidence levels may be used as part of the validation

process illustrated in Figure 25 of the '625 Patent, the confidence levels are a

numeric expression or value reflecting a degree of certainty that the characters

written on the check were read correctly through a "character recognition process."

<u>See</u> '625 Patent, 13:34-41 ("In a step 456 the scanned image file is read and in a

step 458 the neural network contained within the Quickstrokes software recognizes

the characters written in the signature line . . . .  The recognized characters are then

evaluated from the standpoint of a present confidence level in a step 460 . . . .").

The Court also finds Capsec's proposed construction circular, essentially defining

as valid a signature that is not invalid.  This construction would not aid a jury in

understanding the meaning of the term.

The Court also disagrees with NCR's proposed use of the term "authentic." Replacing the term "valid" with "authentic" suggests the technology of the Patents-in-Suit somehow confirms, with total accuracy, that the signature is not a forgery—that is, that the signature on the check was written by the one person who is authorized to write the check. This interpretation is not supported by the intrinsic record. During the <u>Markman</u> hearing, Counsel for NCR conceded that "it's possible that the claim could require something a little bit less [than actual authenticity], which is at least . . . that somebody has made a determination that the actual signature in some sense matches the signature of that person." (Tr. at 127-28). Both of the parties' constructions also ignore that the kind of signature that is the subject of the patents is a cursive one. <u>See, e.g.</u>, '625 Patent, 4:9-16, Claims 1, 20, 35. The Court construes the terms as follows: "Valid signature" is construed as "a cursive signature determined to be a signature with characteristics consistent with the cursive signature of a qualified user." "Valid" is construed as "being a cursive signature with characteristics consistent with the cursive signature of a qualified user." "Validate the document" is construed as "determination that the check or money order bears a cursive signature with characteristics consistent with the cursive signature of the qualified user." "Validity of the document" is construed as "determination that the check or money order bears a cursive

signature with characteristics consistent with the cursive signature of the qualified user."

### C.   Means-Plus-Function Terms

The Court next addresses the means-plus-function terms and NCR's argument that the Patents-in-Suit do not disclose a structure for several means-plus-function terms and are, therefore, invalid for indefiniteness.

The parties' proposed constructions for "means for evaluating a cursive signature on the document and for confirming that the signature is acceptable" are as follows:

| Phrase | NCR's Construction | Capsec's Construction |
|---|---|---|
| "means for evaluating a cursive signature on the document and for confirming that the signature is acceptable"<br><br>'625 Patent, Claim 1 | 35 U.S.C. § 112(f)<br><br>Function:  evaluating a cursive signature on the document and for confirming that the signature is acceptable | 35 U.S.C. § 112(f)<br><br>Function 1:  evaluating cursive signature on a monetary document (properly construed).  The claimed function means looking for where a signature should be and, where a cursive signature is present, assigning it a value. |

23

| | | |
|---|---|---|
| | *Confirming that the signature is acceptable*: determining that the signature on the check is in fact the signature of the maker of the check<br><br>Structure:  indefinite under 35 U.S.C. § 112(b) | Structure:  the structure implementing these functions is a software algorithm such as Figure 25 of the '625 Patent, 13:30-41, implemented on a processor to ascertain one or more characters of the signature field of a document and judge the character(s) from a standpoint of a value associated with the field reflecting a minimum degree of certainty with which the signature must comply, and their equivalents<br><br>Alternative Function 2: Confirming that the signature is acceptable.  The claimed function means determining that the cursive signature complies with specific banking parameters, where non-compliance would result in rejection or otherwise disrupt the process of accepting the monetary document.<br><br>Alternative structure:  a modem connected to the bank ATM network transmits character strings associated with a signature field for further evaluation and confirmation of compliance with specific banking system parameters ('625 Patent, FIG 14, step 470 and associated text at 13:41-55), and equivalents thereof. |

The parties agree that this term is a means-plus-function term governed by 35 U.S.C. § 112(f).  The parties also agree that the claimed function has two parts, but they disagree on their definitions.  NCR argues that "evaluating a cursive signature on the document" does not need to be construed, and that Capsec's proposed construction attempts to expand the claimed function in an attempt to bolster its corresponding structure, which NCR argues is indefinite.  ([69] at 31).  NCR argues that Capsec's proposed function, which includes "looking for where a cursive signature should be," is inappropriate because this language suggests "searching" for a signature—which may not even exist—rather than "evaluating" a signature as the claim language requires.  (Id.).  Capsec does not respond to this argument, and the Court agrees with NCR.

Regarding the term "confirming that the signature is acceptable," the arguments of the parties are similar to the arguments they offered regarding the "valid" terms.  Capsec's proposed alternate function tracks the language of its proposed construction for the "valid" terms.  Consistent with the Court's construction of the "valid" terms, the Court construes the claimed function as follows:  "evaluating a cursive signature on the document and determining that the cursive signature on the check has characteristics consistent with the cursive signature of a qualified user."

25

NCR next argues that Capsec's proposed structure is not an algorithm, and the term is therefore indefinite.  A structure disclosed in the specification qualifies as a "corresponding structure" if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.  Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1311 (Fed. Cir. 2012).  Even if the specification discloses a "corresponding structure," the disclosure must be adequate; the patent's specification must provide an adequate disclosure showing what is meant by the claim language.  The disclosure itself must "identify the method for performing the function, whether or not a skilled artisan might otherwise be able to glean such a method from other sources or from his own understanding."  Id. at 1317.  If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of Section 112.  Id. at 1311-12.  Under 35 U.S.C. §§ 112 ¶ 2 and ¶ 6, therefore, "a means-plus-function clause is indefinite if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim."  Id. at 1312.

In cases such as this one, involving a special purpose computer-implemented means-plus-function limitation, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose

computer or microprocessor." Id. (citation omitted).  The specification must "disclose an algorithm for performing the claimed function." Id. (citations omitted).  "Requiring disclosure of an algorithm properly defines the scope of the claim and prevents pure functional claiming." Ergo Licensing, LLC v. CareFusion 303, Inc., 673 F.3d 1361, 1364 (Fed. Cir. 2012).  The specification can express the algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." Noah, 675 F.3d at 1312 (citations omitted).  Simply disclosing software, however, "without providing some detail about the means to accomplish the function, is not enough." Id.  "[W]here a disclosed algorithm supports some, but not all, of the functions associated with a means-plus-function limitation, we treat the specification as if no algorithm has been disclosed at all." Id. at 1318.

NCR argues that Capsec's proposed algorithm is not clearly linked to the claimed function.  It argues that Steps 456-460 of Figure 25 of the '625 Patent do not provide any detail or information regarding the second portion of the function—"confirming that the signature is acceptable."  Figure 25 is reproduced below:



FIG. 25

'625 Patent, Figure 25.  Figure 25 shows that the "recognized characters" and

"confidence level" are sent to a calling function—it does not, however, show any

steps for "confirming the signature is acceptable."  Capsec notes the '625 Patent

also provides that "[t]he recognized characters [from the signature line] are then

evaluated from the standpoint of a present confidence level in a step 460[,]" which

refers to step 460 in Figure 25.  '625 Patent, 13:39-41.  NCR argues that, at most,

Figure 25 describes steps to ultimately calculate a value, but it "critically does not

make any determination or verification as to the acceptability of the signature."

28

([59] at 29).  The Court agrees.  The identified algorithm does not provide a "step-by-step procedure for accomplishing a given result."  Ergo, 673 F.3d at 1365.

Consistent with the Court's evaluation of the "valid" terms, while confidence levels may be used *as part* of the validation process illustrated in Figure 25 of the '625 Patent, the confidence levels are only a numeric expression or value reflecting a degree of certainty that the characters written on the check were read correctly through a "character recognition process."  See '625 Patent, 13:34-41 ("In a step 456 the scanned image file is read and in a step 458 the neural network contained within the Quickstrokes software recognizes the characters written in the signature line . . . .  The recognized characters are then evaluated from the standpoint of a present confidence level in a step 460 . . . .").  Figure 25 thus does not disclose an algorithm for "confirming that the signature is acceptable," which the Court has construed to require determining that the cursive signature on the check has characteristics consistent with the cursive signature of a qualified user.  At most, Figure 25 discloses only a part of the algorithm required to perform the claimed function.  This is insufficient to disclose an algorithm.  See Noah, 675 F.3d at 1318.

Capsec alternatively proposes the following structure:  "a modem connected to the bank ATM network transmits character strings associated with a signature

field for further evaluation and confirmation of compliance with specific banking

system parameters ('625 Patent, FIG 14, step 470 and associated text at 13:41-55),

and equivalents thereof."  Figure 14, step 470 is reproduced below:



'625 Patent, Figure 14.  In <u>Selex Commc'ns, Inc. v. Google Inc.</u>,

No. 1:09-cv-2927-TWT, 2013 WL 1412334, at *6 (N.D. Ga. Apr. 8, 2013), the

Court considered the construction of "control means for monitoring a telephone

number dialed by a user."  <u>Id.</u>  Selex identified the structure as a figure containing

boxes that stated "capture # dialed" and "evaluate telephone number dialed."  <u>Id.</u>

In determining that these disclosures were insufficient to teach an algorithm for the

claimed function, the Court noted that the figure's "'black boxes' [] simply restate

the function."  <u>Id.</u>  The same is true here.  As NCR notes, the only structure recited

in Capsec's alternative construction is a "modem," but there is no indication that

the modem performs any evaluation or confirmation of the signature.  The modem

at most provides a communication link enabling the system to transmit signature

character information to the bank network.  See '625 Patent, 13:44-47.  Step 470

merely restates that there is some "bank confirmation" that the signature is

acceptable, without disclosing the specific process involved.  Step 470 shows only

that the modem facilitates the back-end bank process of confirming acceptability

and that the bank—rather than the modem—confirms acceptability through some

undisclosed method.  Capsec's alternative structure falls far short of providing a

"step-by-step procedure for accomplishing a given result."  Ergo, 673 F.3d at 1365.

The Court finds that, because the specification is devoid of structure, Claim 1 of

the '625 Patent is invalid for indefiniteness.[9]  Because Claim 1 of the '625 Patent is

invalid for indefiniteness, it is unnecessary to construe the other contested terms in

the claim:  "means for generating image data from the front and back of the

document"; "means for reading the amount of the document"; "means for entering

---

[9]      Throughout its briefs and at the Markman hearing, Capsec argued that a
finding of indefiniteness requires expert testimony.  (See, e.g., Tr. at 184).  This
argument misstates the applicable law with respect to a means-plus-function term
lacking structure.  While the Federal Circuit has admonished that defining a person
of ordinary skill in the art is typically necessary to administer the definiteness test
because terms are construed from the skilled artist's perspective, it also has held
that expert testimony is not a per se requirement and that, when a specification is
devoid of structure, the skilled artisan is unnecessary to find the claim indefinite.
See Verint Sys. Inc. v. Red Box Recorders Ltd., ⎯ F. Supp. 3d ⎯, 2016 WL
54688, at *8 (S.D.N.Y. Jan. 4, 2016) (citing Federal Circuit cases and finding, at
claim construction phase, means-plus-function claims lacking structure to be
invalid for indefiniteness).

data including the monetary amount about a document to be processed"; and "a cash dispenser operated upon acceptance by the evaluating means of the signature to dispense cash automatically to the user." See NetMoneyIN, Inc. v. Verisign, Inc., 545 F.3d 1359, 1366-67 (Fed. Cir. 2008) (a single indefinite limitation invalidates an entire claim).

D.   Cashing System / Cashed

NCR proposes that the phrase "cashing system" in the preamble to Claim 1 of the '625 Patent be construed as a limitation of the claim.[10]   NCR proposes the claim be construed as follows:  "machine that cashes a check or money order in a single transaction" in Claim 1 of the '625 patent.  Capsec argues that, because the phrase "chasing system" appears in the preamble, it should not be construed as limiting.  In the alternative, it offers the following construction:  "to provide cash in exchange for."  NCR also proposes the term "cashed" in Claim 15 of the '625 Patent be construed as "provide cash in exchange for a check or money order and assuming the risk that the check is invalid."  Capsec proposes "to provide cash in exchange for."

---

[10]   Although the Court has found invalid Claim 1 of the '625 Patent, and a construction of "cashing system" is therefore not required, "cashing system" and "cashed" are related terms requiring a similar construction analysis.  The Court conducts its analysis of both terms.

Generally, courts do not treat preamble language as limiting the scope of the claim. Bicon, Inc. v. Straumann Co., 441 F.3d 945, 952 (Fed. Cir. 2006). The Federal Circuit has instructed, however, that a preamble limits a claim when the language of the preamble "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." Vizio, Inc. v. Int'l Trade Comm'n, 605 F.3d 1330, 1340-41 (Fed Cir. 2010) (internal quotation marks omitted). Put another way, a term in a preamble limits a claim where it is the "essence or a fundamental characteristic of the claimed invention." Id. at 1340. "A preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." Id. (internal quotation marks omitted).

The preamble to Claim 1 recites "an automated document cashing system." NCR contends that this preamble recites the essence of the invention and gives life and meaning to the body of the claim because the patent specification provides that the invention is "an automated banking machine system, which performs the usual ATM functions but which additionally cashes money orders and checks for the user without the presence or the assistance of a teller." ([59] at15 (quoting '625 Patent, 3:66-4:3)); see also '625 Patent, 3:21-32; '696 Patent, 3:43-49 ("There is a need for an automatic banking machine . . . that performs and allows a number of

33

service options, such as . . . the cashing of a check, the cashing of a money

order . . . .").  The Court finds that "cashing system" in the preamble to Claim 1 is

a limitation, because it recites the essence or a fundamental characteristic of the

claimed invention.  See Vizio, 605 F.3d at 1340.

Turning to the proper construction of this claim limitation, NCR contends

that the cashing system is a machine that cashes a check or money order in a single

transaction because the Patent teaches the ATM user cannot withdraw pre-existing

balances—the user must withdraw funds corresponding to the deposited document.

NCR argues that Capsec's proposed construction may be improperly interpreted as

including exchanges that involve separate deposit and withdrawal transactions

occurring days apart.  ([59] at 23).  NCR argued at the Markman hearing, "[a]ll we

are trying to get across is that the money that you are depositing, the check you are

depositing, when you get the money out, it has to be the money from the check, not

the money from your account." [11]  (Tr. at 171-72).  The Court agrees that the

---

[11]     The Court finds NCR's proposed "in a single transaction" language is
ambiguous and too limiting.  As Capsec's counsel appropriately noted at the
Markman hearing, "single transaction" could mean "from the time the person steps
up to the machine until the time the person leaves the machine," or different steps
of a single ATM session could be construed as individual "transactions."  (See Tr.
at 160-61).  Capsec's counsel indicated he had no objection to the former
construction.  (See id. at 162).

patent teaches this concept.[12]  During the <u>Markman</u> hearing, the Court proposed: "cashed is that you present an instrument, and in return for that you get money based upon the instrument presented."  (<u>Id.</u> at 172).  Capsec indicated such a construction would be appropriate.  (<u>Id.</u> at 173).  In accordance with this discussion, and based on the claim language and specification, the Court adopts the following construction:  "machine that provides cash, during a single ATM session, up to the amount of the instrument presented."

Regarding the related term "cashed," NCR insists the specification requires that the bank "assum[e] the risk that the check is invalid."  This proposed construction, presumably, is another means to communicate the same concept as above—that the cash corresponds to the instrument presented, rather than being derived from pre-existing funds.  In support of this construction, NCR offers only the Background of the Invention in the '625 Patent, which states:  "if the currency exchange decides to assume the risk and cash such a check . . . ."  '625 Patent, 1:44-51.  The Court finds this language insufficient to support the addition of a cumbersome—and unnecessary—limitation.  In accordance with the discussion

---

[12]     <u>See, e.g.</u>, '625 Patent, 3:21-32 (a user "operates the machine to dispense *automatically* the funds to the machine user." (emphasis added)).

above, the Court construes "cashed" as "provide cash, during a single ATM session, up the amount of the instrument presented."

     E.    <u>Qualified User / User as being Qualified to Use the Machine</u>

NCR proposes the following construction for "qualified user"/"user as being qualified to use the machine" in Claims 1 and 15 of the '625 Patent, Claim 1 of the '948 Patent, Claim 1 of the '600 Patent, and Claim 1 of the '696 Patent: "a user of the ATM whose identity is profiled in recognition feature data, such as voice, facial, retinal, fingerprint and/or signature features or the like." Capsec proposes "a user in possession of a valid banking or ATM card who enters personal identification information that corresponds with the personal identification information associated with that banking or ATM card." As discussed at the <u>Markman</u> hearing, the crux of the parties' dispute is whether the construction should contain a personal identification number ("PIN") as an option to determine whether a user is "qualified."

NCR argues that the patent specifications support the use of feature data such as voice, facial, retinal, fingerprint and/or signature features. <u>See, e.g.</u>, '600 Patent, 1:43-53; '625 Patent, 4:9-16. It argues that where, as here, the patentee has chosen "to be his own lexicographer" by giving certain terms unique or uncommon meanings in the specification, the terms should be construed in accordance with

36

such meanings.  ([59] at 25 (citing Lear Sigler, Inc. v. Aeroquip Corp., 733 F.2d

881, 888 (Fed. Cir. 1984))).  Capsec argues that NCR's only support for its

construction is the description of the preferred embodiment of the '600 Patent, and

that the plain and ordinary meaning of the terms includes qualification by PIN.

"The standards for finding lexicography and disavowal are exacting.  To act

as its own lexicographer, a patentee must clearly set forth a definition of the

disputed term other than its plain and ordinary meaning and must clearly express

an intent to redefine the term." Hill-Rom Servs., Inc. v. Stryker Corp., 755 F.3d

1367, 1371 (Fed. Cir. 2014).  The Federal Circuit has "found [a] disclaimer

limiting a claim element to a feature of the preferred embodiment when the

specification described that feature as a 'very important feature . . . in an aspect of

the present invention' and disparaged alternatives to that feature." Id. (citing Inpro

II Licensing, S.A.R.L. v. T-Mobile USA, Inc., 450 F.3d 1350, 1354-55 (Fed. Cir.

2006)).

Here, there is no such disclaimer or lexicography.  "There are no words of

manifest exclusion or restriction." Id.  NCR has not identified anything in the

specification or prosecution history that makes clear that the invention excludes the

use of a PIN.  "Absent such language, we do not import limitations from the

specification into the claims." Id.  The Court also finds Capsec's construction too

limiting, because it could be read as allowing *only* the use of a PIN.  This construction is too narrow in light of the preferred embodiment.  The Court construes the term as follows:  "a user of the ATM whose identity is evaluated using recognition feature data, such as voice, facial, retinal, fingerprint, signature features or the like, and/or a personal identification number presented by the user."

> F.    A Card Having an Intelligence Associated Therewith

NCR proposes "a card having an intelligence associated therewith" in Claim 1 of the '600 Patent, Claim 1 of the '696 Patent, and Claim 1 of the '948 Patent be construed as "a smartchip or similar card with a microchip."  Capsec proposes "an ATM-like card including a form of validation intelligence, including such things as biometric validation or use of a pin [sic] number for validation."

NCR argues that a card with intelligence is "widely accepted to be a plastic card having a computer chip or integrated circuit of some kind embedded within it."  ([59] at 38-39).  NCR argues that Capsec's proposed construction attempts to read out the word "intelligence" and would include a traditional card with a magnetic stripe, which is "without question not an 'intelligent' card."  ([59] at 39).  In support of its argument, NCR shows the Patents-in-Suit contemplate using

"IC[13] cards or smart cards." '600 Patent, 9:48-49.  As Capsec points out, the full language of this specification is "components of the apparatus **10** which are to receive an ATM card which can be inserted through an insert, slot or opening **14** in a front wall **16** of the housing **12**.  The insert slot **14** will accept the usual ATM card, credit cards, IC cards or smart cards."  Id.  Capsec thus argues that the specification shows that smart cards are "but one option the specification teaches for the 'card' and that the other options need not contain a microchip."  ([57] at 18).  Capsec also notes that the Abstract states "[v]alidation of the identity of the user is performed with the use of a card associated with intelligence that identifies the user." '600 Patent, Abstract.  The preferred embodiment also includes an ATM card verified as "associated with a qualified password or PIN." '600 Patent, 3:61-65.  Capsec argues that NCR incorrectly attempts to import a limitation into a claim from one embodiment described in the specification.

The Court does not credit NCR's contention that the term requires that the intelligence be embedded within the card itself.  The plain language of the term requires only that the card have an intelligence "associated therewith"—not that the card itself is intelligent or is a "smart card."  NCR does not provide any support

---

[13]     Integrated Circuit.

to show that "intelligence" as associated with a card at the time of the application would not include the use of a PIN.[14]  Further, "[a] claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support."  Rambus Inc. v. Rea, 731 F.3d 1248, 1253 (Fed. Cir. 2013) (internal quotation marks omitted).  The preferred embodiment includes an ATM card verified as "associated with a qualified password or PIN." '600 Patent, 3:61-65.  NCR has not provided highly persuasive evidentiary support for its proposed construction which would justify excluding the preferred embodiment, and the Court thus rejects NCR's construction.  The Court construes the term as follows:  "an ATM card with embedded validation intelligence, such as a microchip, or which is accompanied by validation intelligence such as biometric validation or inputting of a PIN for validation."

G.    Document Scanner; Scanning/Scanned

NCR proposes the terms "document scanner" and "scanning/scanned" in Claim 1 of the '600 Patent, Claim 1 of the '696 Patent, and Claim 1 of the '948 Patent be construed as follows:  "document scanner" is "an optical device used to put images from a piece of paper into digital form by sweeping across the image";

---

[14]    NCR relies on an article published in 2010 to support that a card with a magnetic stripe is not a smart card.

"scanning" is "using an optical device to put images from a piece of paper into digital form by sweeping across the image"; and "scanned" is "used an optical device to put images from a piece of paper into digital form by sweeping across the image."  Capsec proposes the following:  "document scanner" is "an optical device used to input graphic images into a computer, allowing images from a piece of paper to be put into a digital form, whereupon they can be recognized by a computer"; "scanning" is "using an optical device to input graphic images into a computer, allowing imagery from a piece of paper to be put into a digital form, whereupon they can be recognized by a computer"; and "scanned" is "having been reduced to digital form by a scanner (properly construed)."

The crux of the parties' disagreement is whether the terms include a sweeping motion.  Capsec argues that "sweeping" is not required, and the patents point to the use of a camera to create a scan of an image without any mention of sweeping.  '600 Patent, 14:18-20 ("The scanner using the camera in 58 and 60 scans both sides of the documents and reads the magnetic ink via a magnetic transducer in a step 424.").  Capsec also relies on prior art in support of its argument.  It points to U.S. Patent No. 4,205,780, which specifies that "each document passes over an OCR drum."  ([57.4], 7:15).  NCR argues that Capsec's reliance on this prior art concedes that sweeping is contemplated by the patent

41

language, whether the sweeping is performed by the camera or the check itself "sweeps" over the camera. The Court agrees. The common and ordinary understanding of "scanning" supports that there is a sequential—part by part—examination.[15, 16] This understanding supports NCR's proposed constructions: "document scanner" is "an optical device used to put images from a piece of paper into digital form by sweeping across the image"; "scanning" is "using an optical device to put images from a piece of paper into digital form by sweeping across the image"; and "scanned" is "used an optical device to put images from a piece of paper into digital form by sweeping across the image." The Court adopts these proposed constructions.

H.    <u>Confidence Level</u>

NCR proposes the term "confidence level" in Claim 6 of the '600 Patent, Claims 1 and 2 of the '696 patent, and Claim 7 of the '948 Patent be construed as "a numeric expression or value reflecting a degree of certainty." Capsec proposes

---

[15]    Capsec's proposed construction would be more appropriate if the claims used the term "imaging."

[16]    Merriam-Webster offers the following definitions of "scan" applicable in this context: "to examine by point-by-point observation or checking;" "to examine systematically (as by passing a beam of radiation over or through) in order to obtain data . . .;" and "to pass over in the formation of an image." Scan, Merriam-Webster. All three definitions support the notion of a sequential examination.

"a numeric expression or value associated with an image or portion thereof reflecting a belief in terms of the degree of certainty that the image or portion thereof complies with specific banking parameters."  In its responsive claim construction brief, Capsec states that, "[u]pon further consideration, Capital Security submits that both its and [NCR]'s proposed constructions for 'confidence level(s)" are supported by the evidence and would assist the jury.  The Court finds NCR's proposed construction sound, and adopts it.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the patent terms, phrases, and clauses found in the asserted claims of United States Patent Nos. 5,897,625; 7,653,600; 7,991,696; and 8,121,948 shall be construed in accordance with the terms of this Order.  A table of the Court's ruling and constructions adopted by the Court is attached as Exhibit A to this Order.


**SO ORDERED** this 28th day of June, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE